# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DEVEREUX ADVANCED
BEHAVIORAL HEALTH,

      Plaintiff,

v.

JOHN DOE, JANE DOE, AND
DAVID DOE, AS PARENTS OF
JOHN DOE, BELMONT PUBLIC
SCHOOLS, and THE BUREAU OF
SPECIAL EDUCATION APPEALS of
the MASSACHUSETTS DIVISION
OF ADMINISTRATIVE LAW
APPEALS,

      Defendants.

Docket No. 21-CV-_____

**COMPLAINT FOR DECLARATORY AND OTHER RELIEF FROM DECISION OF THE BUREAU OF SPECIAL EDUCATION APPEALS PURSUANT TO 20 U.S.C. 1415(i)(2)**

## PRELIMINARY STATEMENT

1. This is a complaint for judicial review of a final decision and order rendered by the Defendant Bureau of Special Education Appeals of the Massachusetts Division of Administrative Law Appeals, pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1482, and M.G.L. c. 71B. (A true copy of that decision is attached hereto as Exhibit A.) The Plaintiff, Devereux Advanced Behavioral Health ("Devereux" or "the School") is a private, non-profit, special education school for students with emotional, behavioral and cognitive differences. It operates a day school and residential programs for children and young adults aged 6-21. Devereux's population generally presents with issues including disruptive behaviors, mood/anxiety disorders, complex trauma, psychotic

symptoms, high functioning pervasive developmental disorders ("PDD"), abuse-reactive behaviors, and Autism Spectrum Disorders.

2. Devereux brings this action seeking declaratory and other relief from a decision issued by the BSEA on February 5, 2021.  This decision determined that Devereux is the "stay put" put placement (under 20 U.S.C. § 1415 (j) of the IDEA) for the Defendant Student, which effectively means that notwithstanding the emergency situation, Devereux must continue to provide services to the Defendant student.

3. Devereux undertook an emergency termination of Student John Doe on July 20, 2020, pursuant to regulations of its licensing agency, the Department of Elementary and Secondary Education ("DESE") (603 CMR 28.09(12) and 603 CMR 18.05(7)(b) and (d)), based on the school's inability to keep Student from being a clear and present threat to the health and safety of himself and others.  His unsafe behaviors include physical assaults on staff (causing serious injuries like broken noses) and bolting, sometimes doing so while dressed inappropriately for freezing temperatures.  Those regulations do not impose a stay put requirement on private schools.  Despite complaints from the parents, DESE has neither imposed any sort of sanction on Devereux nor required that Devereux continue to provide services to John Doe.

4. Following the Defendant Student's emergency termination from Devereux, the Defendant Parents and the Defendant Student filed an Accelerated Hearing Request and Motion for Stay Put with the BSEA on November 6, 2020 seeking, *inter alia*, relief including but not limited to an immediate order from the BSEA finding the following:  that Devereux is the student's placement under the stay put provisions of the IDEA; that the emergency termination was improper; and that their attorneys' fees will be paid by Devereux and Belmont.  On December 15,

2020, Parents filed a Motion for Leave to Amend their Accelerated Hearing Request, which request was granted.  Later, Parents requested to take the matter off the Accelerated track.  By agreement of the parties, the matter was continued for hearing in January of 2021.  On December 22, 2020, Devereux filed a Request for Accelerated Hearing and a Motion to Consolidate with Parents' Hearing Request, which motion was granted.  The hearing was held remotely via Zoom on January 6, 7, 11 and 14, 2021, before Hearing Officer Rosa Figueroa.

5. Despite finding that Student was in an emergency situation and a threat to himself and others at Devereux, the Hearing Officer granted Parents' request for relief, ordering that Devereux be required to maintain the placement as a "stay put" placement during the pendency of Parents' appeals, unless Devereux could show an ongoing emergency after another team meeting ordered by the Hearing Officer.

6. In this action, Devereux seeks the following:

   a. A reversal of the stay put aspects of the BSEA decision;

   b. A declaratory judgment establishing that:

      i. Stay put under 20 U.S.C. § 1415 (j) does not apply to a private special education school in Massachusetts when the private school is terminating or has terminated a student on an emergency basis in accordance with the regulations promulgated by DESE; and

      ii. The Student and his Parents are not entitled to recover any attorneys' fees against Devereux under § 1415(i)(3) of the IDEA and 34 C.F.R. § 300.517, on the grounds that (1) the Student and Parents are not to be considered "prevailing parties" with regard to the BSEA decision; and (2) that provision of the IDEA only applies to local educational

3

agencies, state educational agencies, and parents; it does not apply to private special education schools such as Devereux;

   iii.  Such other relief as this Court deems just and proper.

## JURISDICTION

7. This Court has jurisdiction over the subject matter of this action pursuant to 20 U.S.C. § 1415 (i)(2)(A) and 28 U.S.C. § 1331.

## VENUE

8. Venue is proper in this district and Court pursuant to 28 U.S.C. § 1391(b).

## THE PARTIES

9. The Plaintiff, Devereux Advanced Behavioral Health, is a private school operated by the Devereux Foundation, a 501(c)(3) not for profit behavioral health organization. Devereux Foundation operates in several states in addition to Massachusetts.  The Plaintiff has a principal place of business at 60 Miles Rd., Rutland, MA  01543.

10. The Defendants, Jane Doe and David Doe, are the mother and father and co-guardians of the student in this case, the Defendant John Doe.

11. The Defendant, Belmont Public Schools ("Belmont"), is a public school district duly organized, established, and existing under the laws of the Commonwealth of Massachusetts.  Belmont's principal place of business is 644 Pleasant St., Belmont, MA  02478.  At all relevant times, the Defendant Belmont is and was the Local Education Agency responsible for providing a Free Appropriate Public Education for John Doe pursuant to the IDEA, under 20 U.S.C. §§ 1400 *et seq.*

4

12. The Defendant, The Bureau of Special Education Appeals, is a government agency
    with a principal place of business located at 14 Summer Street, 4th floor, Malden,
    MA 02148.  The BSEA is an agency of the Massachusetts Division of
    Administrative Law Appeals, and conducts administrative due process hearings on
    disputed special education matters pursuant to 20 U.S.C. § 1415(f) and M.G.L. c.
    71B.

### FACTS

**A.  THE DEVEREUX PROGRAM**

13. Devereux operates a 365 day per year residential program, and its day school runs
    216 days per year.  Devereux serves students with issues including disruptive
    behaviors, mood/anxiety disorders, complex trauma, psychotic symptoms, high
    functioning pervasive developmental disorders ("PDD"), abuse-reactive behaviors,
    and Autism Spectrum Disorders.  Behaviorally, those students present with a
    multitude of characteristics, including but not limited to the following:  self-harm;
    suicidal behavior; suicidal ideation; bolting or runaway behavior; low frustration
    tolerance; verbal aggression; physical aggression; property destruction; tantrum
    behavior; defiance; inability to follow rules; and over-reliance on staff prompting.

14. Devereux's behavioral approach to treatment for residents of its Hillcrest Group
    Home is described as follows in its Statement of Purpose: "Hillcrest provides
    flexible and individualized treatment, rehabilitation, and support/supervision
    services that vary in intensity and are based upon the needs of our youth and their
    families.  In addition to using Applied Behavior Analysis, as an overarching
    evidence based model of care, the group home treatment model also endorses the
    use of positive behavioral intervention and trauma informed care with a relational

approach to create an environment in which youth thrive and develop new skills that replace barrier behaviors.  All services provided focus on promoting practices that lead to sustained positive outcomes for youth and families.  Our treatment and rehabilitation services promote family driven and youth guided care."

### B.  JOHN DOE AND HIS HISTORY AT DEVEREUX

15. John Doe is 21 years old.  He was placed in Devereux's residential program on June 9, 2017 by his parents and BPS.   His diagnoses include the following: Pediatric Acute-onset Neuropsychiatric Syndrome / Pediatric Autoimmune Neuropsychiatric Disorders Associated with Streptococcal Infections ("PAN/PANDAS") and Sydenham's Chorea.

16. John has been in an emergency situation at Devereux for over a year.  He continues to demonstrate increasingly unsafe behavior.  Despite 1:1 staff support on 1st and 2nd shift and 2:1 staff support on the 3rd shift, John  presents with significant safety interfering behaviors.  Since the initiation of the Emergency Discharge notice on July 20, 2020, John has engaged in safety interfering behavior requiring the use of physical management 52 times as of April 23, 2021.  In that same time-frame, John has engaged in physical aggression to a person over 41 times.  John also engages in "bolting" behavior which is life threatening.  Under state regulations, Devereux cannot prevent John from leaving the residence and when he does so, he can suddenly, and without warning, take off. He is extremely fast.  He has been found in an active construction site across the road from his residence and he has also bolted to a public road which is used by Devereux staff and others**.**

17. John's behaviors in that last month have included bolting down the hill (in the direction of the community) multiple times including one time during inclement weather, climbing onto vehicles, and running into an active construction site.  To be clear, John's bolting behaviors present safety concerns surrounding his lack of self-preservation skills especially during inclement weather and his desire to access the active construction site on campus.  John has attempted to gain access to the construction site several times, including at night when there is limited visibility and an accident could easily happen.  Additionally, while John has been approved for 2:1 staff support on the overnight, much of the campus is 1:6 ratio during that same shift.

18. Moreover, staff are increasingly unwilling to work with John due to the frequency, intensity, and severity of his assaultive behaviors.  Multiple staff have reported significant difficulties when it comes to their ability to keep John safe.  For example, staff injuries at the hands of John have included broken noses, punches to the face, punches to the forehead, elbows to the mouth, and concussions.  Many staff will only pick up shifts under the condition that they are not working directly with John.

**C.  JOHN DOE'S TERMINATION FROM DEVEREUX**

19. On July 20, 2020, Devereux undertook an emergency termination of John pursuant to 603 CMR 28.09(12), and 603 CMR 18.05(7)(b), (d).  DESE was notified in a Form 2 and John's parents have contacted DESE.  Despite the parents' complaint to DESE, DESE has not cited Devereux for non-compliance and DESE concurs with the termination.  The special education department for the Town of Belmont has also "assumed responsibility" for John under 603 CMR 28.09(12) by

7

sending out referral packets to alternative placements on or about August 5, 2020 and by acknowledging the termination letter.

20. In response to the referral packets sent out by the Town of Belmont, one program -- the Judge Rotenberg Center ("JRC") -- indicated on August 27, 2020 that John would be appropriate for admission.  However, John's parents have refused to fully cooperate in this proposed placement.

21. DESE and Devereux have made the decision that the situation for John at Devereux is unsafe and that emergency exists.  Accordingly, it would be improper for the BSEA to order a stay put since it would effectively override the considered professional judgments of Devereux and DESE.  See *In re: Student v. Georgetown Public Schools and Landmark School* (BSEA No. 1408733).

22. On or about October 17, 2019, Devereux learned that John was being physically restrained in his group home in order to receive medical injections.  That led Devereux to re-evaluate John's placement in November of 2019.  Devereux requested meetings with Belmont Public Schools and the family.  In the meantime, the family requested that Devereux resume administration of the medication injections with the use of a "calming hug."

23. On or about December 4, 2019, Devereux informed the parents that Devereux could not and would not resume the administration of injections using "supportive holds," as to do so would fall outside the scope of Devereux's license and program.

24. Around the same time, Devereux expressed to Belmont that it had concerns about its ability to meet John's complex needs and questioned whether Devereux was still an appropriate placement.

25. On January 15, 2020, the Team held an "IEP and Systems Meeting," at which the Team decided that Devereux was no longer a safe and appropriate placement, and

8

it would be in John's best interests to seek an alternative placement.  On June 23, 2020, there was a Treatment Review meeting, during which John's parents attributed John's increasingly unsafe behaviors to the pandemic and lack of injections.  Devereux asked that Belmont provide an update on the referral process in 30 days.  Belmont agreed to provide 2:1 staffing in the interim.

26. On July 20, 2020 as a result of John's increasingly unsafe behaviors (including aggression toward staff, medication refusal, bolting, and his refusal to attend school), Devereux issued an emergency discharge letter to the family and Belmont, consistent with the emergency termination regulations.  Devereux also filed a Form 2 Immediate Notification to DESE.  The discharge letter identified September 17, 2020 as the discharge date, as Devereux, in good faith, wanted to allow sufficient time to secure a successor placement.  John was not attending school and was simply being "warehoused" at Devereux, and not receiving FAPE.  Because of his aggressiveness, his bolting behavior and his property destruction, he has received less than one half hour of education in all of calendar year 2020.  When he is taken to a classroom, he will engage in property destruction of other disruptive activity and have to leave. He therefore remains in the residence and receives no instruction.  It is a violation of licensing requirements with DESE for Devereux to provide what is essentially custodial care for John.

### D.  APPLICABLE REGULATIONS REGARDING TERMINATION

27. Devereux has properly terminated John on an emergency basis pursuant to 603 CMR 28.09(12), and 603 CMR 18.05(7)(b), (d).  There is no contention to the contrary. DESE has been notified of the termination with a Form 2 and Devereux is in full compliance with the DESE regulations, despite the parents' complaints to

DESE.  While Devereux is sympathetic to the parents, they have failed to follow through with an identified alternative placement.  In addition, John has frequently been hospitalized in the past and a hospital would be a safer placement for John than Devereux.

28. According to 603 CMR 28.09(12)(b), in the event that an approved private school like Devereux decides that it needs to terminate the enrollment of a student on an emergency basis (because he or she presents a clear and present danger to himself, herself or others), the following procedure must be followed:  "The special education school shall not terminate the enrollment of any student, even in emergency circumstances, until the enrolling public school district is informed and assumes responsibility for the student. At the request of the public school district, the special education school shall delay termination of the student for up to two calendar weeks to allow the public school district the opportunity to convene an emergency Team meeting or to conduct other appropriate planning discussions prior to the student's termination from the special education school program. With the mutual agreement of the approved special education school and the public school district, termination of enrollment may be delayed for longer than two calendar weeks."

29. 603 CMR 18.05(7)(b) and (d) provide as follows:  "(b) The school shall, at the time of admission, make a commitment to the public school district or appropriate human service agency that it will try every available means to maintain the student's placement until the local Administrator of Special Education or officials of the appropriate human service agency have had sufficient time to search for an alternative placement."  "(d) In case of an emergency termination, which shall be defined as circumstances in which the student presents a clear and present threat

to the health and safety of him/herself or others, the school shall follow the procedures required under 603 CMR 28.09(12)."

30. Devereux followed the emergency termination procedures which are spelled out in these regulations, and DESE determined that Devereux did everything that it is required to do.

### E. EVENTS FOLLOWING EMERGENCY TERMINATION

31. When one looks at the data showing the frequency of John's incidents of aggression, bolting, and other highly risky behaviors, there is a marked increase of such incidents in 2020, as compared to 2019.   Specifically, incidents of aggression toward people went from 24 to 70; incidents of bolting ("out of supervision/program area" went from 4 to 66; and incidents of "highly risky behavior" went from 3 to 12.  Devereux School Principal Ann Minihane defined "highly risky behaviors" as "anything that would place the student or others at an increased risk," including "anything from eating inedible objects, to posturing – attempting to assault . . . running, you know, into the woods.  So sort of like a high-risk out of area, those type of things.  Running into a construction site." (Minihane, Transcript Vol. III, p. 16, lines 3-9).

32. On August 4, 2020, the parents sent Devereux a letter and a purported prescription from Dr. Volozhanina stating that John "requires gentle physical restrain [sic] by physical hold for the duration of I/M [intramuscular by needle] medication administration."  Devereux's license with DESE does not allow for such physical intervention and forced administration of medication against the will of the person.  In addition, John is an adult and there is no *Rogers* order that would authorize the administration of medication against his will.

33. An emergency Team meeting was held on August 5, 2020.  Belmont represented that it had sent out referral packets to multiple potential placements.

34. In late August of 2020, John's family began to engage with the Judge Rotenberg Center as a possible successor placement.  On August 27, 2020, JRC indicated to Devereux that it would be a "most appropriate fit" for John, and "the only hold up was that [John's mother] needed to come see the program."

35. On September 2, 2020, JRC reiterated that John did meet the general admission criteria and would be a good fit for the program, but that it was still awaiting a call from the parents to set up a visit.  JRC also stated that the estimated wait list was about two months.

36. On September 15, 2020, Devereux informed the parents and Belmont that because the Team was "in the process of securing a placement at JRC," Devereux was willing to "extend the time frame and support the trans*ition* as long as the visit to JRC is set up by September 17th."

37. In the meantime, none of the other potential placements accepted John.  John's mother informed Devereux that she was going to visit JRC on October 14, 2020, even though Devereux wanted it to take place earlier.

38. On October 6, 2020, a Treatment Review was held, and on October 15, 2020, Devereux informed the Team that a transition plan was needed by November 1, 2020 and that Devereux was willing to support and maintain John during a wait list period as long as placement at JRC had been accepted by the parents.

39. On October 20, 2020, JRC informed Devereux that it was still waiting on the parents to move forward with the placement.  On that same day, John's mother informed Devereux that the family had "yet to receive any indication that [JRC]

accepted [John], however [the parents] do not feel that they have an appropriate program."

40. On October 21, 2020, Devereux informed the family and Belmont that because the parents had declined to move forward with the JRC placement, Devereux was going to continue with the discharge, and that there would need to be a discharge plan in place by November 1, 2020 with a final discharge date of November 14, 2020.

41. On October 31, 2020, John's mother responded by stating that the family was continuing to work to find an appropriate placement.

42. In the meantime, John's behaviors were presenting a clear and present threat to the health and safety of John, Devereux staff, and other Devereux students, as set forth above.

## F.  INITIATION OF THE BSEA HEARING

43. On November 6, 2020, the parents filed at the BSEA, and asserted John's alleged right to "stay put" at Devereux.  They asserted that stay put even though they have declined to move forward with a clearly identified placement and even though John remains a threat to himself and others at Devereux.  As stated earlier, after an exhaustive search by the Team, JRC remains the only available option, and it appears to be a much safer and appropriate alternative than Devereux.

44. Following the Student's emergency termination from Devereux, the Parents and the Student filed an Accelerated Hearing Request and Motion for Stay Put with the BSEA on November 6, 2020.

45. On December 15, 2020, Parents filed a Motion for Leave to Amend their Accelerated Hearing Request, which request was granted.  In their Amended Request for an Accelerated Hearing, Parents were seeking the following:

a. An interim order entitling John to stay put at Devereux during the pendency of this dispute;

b. An order entitling John to stay put at Devereux  until another appropriate placement is identified and becomes available;

c. An order compelling Belmont to arrange and fund any additional personnel or services to maintain John's and others' health and safety while he remains at Devereux;

d. An order finding that any potential placement of John at JRC, if applicable, by Belmont is inappropriate, as it fails to provide John with a free appropriate public education ("FAPE"), pursuant to 20 U.S.C. §§ 1400-87, M.G.L. c. 71B, and the regulations promulgated under each of those statutes;

e. An order finding that Devereux's emergency termination of John is improper, as it fails to meet the "clear and present threat" standard articulated in 603 CMR 18.05(7)(d);

f. Attorneys' fees; and

g. Such other further relief as may be just.

46. On December 22, 2020, Devereux filed a Request for Accelerated Hearing and a Motion to Consolidate with Parents' Hearing Request, which motion was granted. In that Request for Accelerated Hearing and Motion to Consolidate, Devereux was seeking the following relief:

a. An order stating that stay put does not apply to approved private special education schools, or, in the alternative, stating that Devereux is not John's stay put placement.  Rather, John's stay put rights apply to only Belmont

Public Schools or the Massachusetts Department of Elementary &
Secondary Education or both;

b.  An order stating that Devereux is within its rights under 603 CMR
18.05(7)(d) and 603 CMR 28.09(12) to immediately and forthwith terminate
John's current placement at Devereux on an emergency basis, because he
presents a clear and present threat to his own health and safety, as well as
to that of Devereux's other students and staff;

c.  An order granting this matter Accelerated Status (pursuant to Rule II D of
the Hearing Rules for Special Education Appeals, due to the well-
documented fact that the health and safety of the student and others would
be <u>further</u> endangered by delay;

d.  An order consolidating this action with BSEA action # 2103476 (entitled
*[John Doe] v. Belmont Public Schools and Devereux Advanced Behavioral
Health*); and

e.  Such other relief as may be just.


**G. THE BSEA PROCEEDINGS AND RELEVANT TESTIMONY THEREFROM**

47. The hearing was held remotely via Zoom on January 6, 7, 11 and 14, 2021, before
Hearing Officer Rosa Figueroa.

48. The following witnesses testified at the hearing:  John's mother, Jane Doe; John's
father, David Doe; pediatrician and neurologist M. Elizabeth Latimer, M.D.;
neuropsychologist Joseph Moldover, Psy.D.; Cheryl Davis, Ph.D., LABA, BCBA-D;
Belmont Out-of-District Coordinator Mary Jane Weinstein; Devereux School
Principal Ann Minihane; Devereux Assistant Executive Director Nadyia Abbas-
Peck, Psy.D.; and Devereux Director of Clinical Services Ashley Warhol, Psy.D..

15

49. During the course of the hearing, the following testimony was offered by Devereux witnesses:

    a. When asked by Mr. MacLeish if she believed that "there is currently a clear and present danger to [John] and others if he were to remain at Devereux," Ms. Minihane responded, "Absolutely.  Absolutely do."  (Minihane, Transcript Vol. III, p. 67, lines 5-8).

    b. When asked by Mr. MacLeish if John had received any educational services since January of 2020, Devereux Assistant Executive Director Nadyia Abbas-Peck responded that he had not:  "It has been offered, but he has not been able to partake."  (Abbas-Peck, Vol. II, p. 130, lines 4-10).

    c. When asked by Mr. MacLeish if she had an opinion as to whether or not John's continued presence in the program at Devereux represented "a clear and present threat to his health and safety and the safety of others," Ms. Abbas-Peck responded, "Yes.  Unfortunately, I do think that. . . . It is primarily due to the fact that he is – his frequency and intensity of some of his behaviors."  (Abbas-Peck, Vol. II, p. 111, lines 14-24).

    d. When asked that same question by Mr. MacLeish, Devereux Director of Clinical Services Dr. Ashley Warhol responded as follows: "Yes. Absolutely. We have seen – We have seen a significant increase in the intensity of his aggressive behaviors.  While he did engage in aggression previously, the number of staff injuries as a result of his aggression has increased substantially.  In addition to that, his elopement behaviors have continued to increase.  And, you know, while we're in a rural area, we're by no means a safe and sterile environment.  And, you know, we're surrounded by woods that he could easily get lost in.  There's a lake surrounding the road into our

– our campus.  We have a construction site that many people have talked about which poses other safety hazards.  And that being said, he engages in several hours of [outside] pacing per day, and given his compromised immune system as well as the cold temperatures, you know, that could have really concerning effects on his overall health and wellness."  (Warhol, Vol. III, p. 121, lines 2-22).

e.  When asked by Mr. MacLeish if she "was satisfied that Devereux had used everything within its expertise and ability to provide treatment for [John] as well as an education," Dr. Warhol testified as follows:  "Yes.  We have worked collaboratively all along with the parents and have followed through with any requests for specialists, outside consultants, trying different arrangements with behavior plans, different reinforcers, schedules.  The parents have even made suggestions about treatment modalities that they would like to see us use, and we've tried to implement those.  Not only that, we've had a number of BCBAs who have consulted on this case in some capacity – you know, whether they were supervising the case or other individuals who are attached to Devereux – and, you know, pushing [a functional behavior assessment, or FBA] was never something that came out of a recommendation from any of those experts.  We've also had community-based providers come in.  We had – the parents had hired an OCD CBT specialist from the community who came in, and we worked collaboratively with that individual to try to address his OCD-like behaviors.  And, you know, I – I truly feel that we have exhausted our ability to maintain him safely."  (Dr. Warhol, Vol. III, p. 119, line 22 – p. 120, line 21)  (emphasis added).

17

50. One of the family's expert witnesses, Dr. Joseph Moldover, testified that he believed that "safety is obviously the most pressing need.  I think also communication.  I do not believe that academics should be a priority at the moment, given the clinical concerns and his age." (Dr. Moldover, Vol. I, p. 161, lines 15-19).  Given that Devereux is, at root, a school, Dr. Moldover's concession that John's academic needs are not a priority effectively and convincingly supports the premise that John was/is not an appropriate placement at the Devereux School.

51. When asked by Mr. MacLeish if she would agree that "Devereux may not be an appropriate placement for [John] at the present time," another of the family's experts, Dr. Latimer, testified that "[i]t might not be." (Dr. Latimer, Vol. I, p. 72, lines 3-5).  She was also asked for her opinion on the degree to which John could currently benefit from psychological or behavioral interventions like Applied Behavior Analysis ("ABA"), and she testified that those sorts of interventions are "not effective until you've treated the underlying medical condition," and they are more effective in the "recovery phase." (Dr. Latimer, Vol. IV, p. 13, lines 15-21).  She added that with patients diagnosed with PANDAS (like John), "you can't quite predict" when John could benefit from those interventions offered at Devereux, but it could be six months or longer before such interventions might be effective.  Id. at p. 14, line 19 – p. 15, line 1).

52. When Mr. MacLeish asked the family's third expert witness, Dr. Cheryl Davis, if she agreed that "there's a current threat to his health and safety," she responded, "I agree." (Dr. Davis, Vol. I, p. 247, lines 6-9).  When Mr. MacLeish followed up by asking her if that threat would be "resolved" if Devereux adopted all of her recommended modifications to its approved program, she conceded that she "could

not guarantee that." <u>Id.</u> at lines 10-15.  This also supports the premise that Devereux was/is not a safe and appropriate placement.

**H. THE HEARING OFFICER'S DECISION AND ORDER**

53. Hearing Officer Figueroa issued her decision on February 5, 2021.  In it, she framed the issues to be decided as follows:

    a. Whether Devereux continues to be an appropriate placement for Student;

    b. Whether the BSEA has authority to order stay put at a private school; and if so,

    c. Whether Devereux should remain Student's stay put placement until a DDS adult placement is identified and available for Student.

54. Despite the fact that Devereux repeatedly and specifically asserted in its pleadings that the BSEA lacks the legal authority to order stay put when a private school has commenced an <u>emergency</u> termination of a student, pursuant to the Massachusetts emergency termination regulations (603 CMR 28.09(12) and 603 CMR 18.05(7)(b), (d)), Hearing Officer Figueroa never addressed that specific issue. Devereux asserted that particular argument in the following pleadings:

    a. Devereux's Response to "Parent's Request for an Accelerated Hearing and Motion for Stay-Put" ("Stay-Put does not apply to situations in which a private school has lawfully terminated a student on an emergency basis pursuant to state law.");

    b. Devereux's "Additional Opposition" to Parent's Motion to Enforce Stay-Put ("The DESE Private School regulations do not mandate 'stay-put' in emergency terminations by private schools."); and

c. Devereux's "Request for an Accelerated Hearing and Motion to Consolidate" ("Stay-Put does not apply to situations in which a private school has lawfully terminated a student on an emergency basis pursuant to state law.").

55. The Hearing Officer's findings included the following:

a. ". . . I find that Devereux has met its burden of persuasion regarding the inappropriateness of its program because of safety concerns but did not meet its burden of persuasion regarding the applicability of stay-put rights to private schools or that it is not Student's stay-put placement, and Parents have met their burden of proof that Devereux remains Student's stay-put placement until another viable placement is secured, or one is created by Belmont."

b. "To the extent that any party to a BSEA proceeding seeks relief inconsistent with the services provided by the private special education school, Devereux is correct that the BSEA lacks authority to order those additional services. However, if the services fall within the array of services and methodologies implemented at the special education private school, the result is different."

c. "Devereux is correct that the testimony at Hearing supports a finding that, at present, the Devereux program as currently constituted is not appropriate, as serious safety issues that impact Student and those around him exist . . . .  Long term, Devereux is not the appropriate placement for Student, but as discussed below, since Student is legally entitled to stay-put at Devereux, safety concerns must be addressed to increase everyone's safety while he is there.  The evidence supports a finding that modifications consistent with the nature of Devereux's program can be implemented. Parents persuasively argued that additional services and supports (as well

20

as Parents' cooperation), may increase safety for Student and everyone at Devereux, until an appropriate program becomes available."

d. "Devereux's staff represented that it was an ABA informed program, and that if Student required a strict ABA approach it could not be done there. With its current staff this appears to be correct, but the evidence is persuasive that strict implementation of ABA services would be counterproductive, thus not needed. Instead, the types of more gentle, destressing supports already available, albeit with some modifications, is what is needed."

e. "[C]ontrary to Parents' assertions, the record shows that Devereux and Belmont have fulfilled their mandates pursuant to 603 CMR 28.09(12)(b); it has now been more than six months since Devereux invoked emergency termination."

f. "This case is different in that [Judge Rotenberg Center], the <u>only</u> potential option, has offered Student a conditional acceptance and only when it has a vacancy. As such the issue is not ripe. . . . [L]eaving Student without an equivalent appropriate placement is contrary to the IDEA." (emphasis in original).

g. "Devereux is correct that the JRC application process must be completed despite Parents' apprehensions about this program, given that this is at present the only possible viable successor placement for Student."

56. The Hearing Officer ultimately ordered the following:

a. Devereux and Belmont shall immediately convene Student's Team inclusive of Dr. Latimer and any other relevant professional or consultant that can help support Student's program to maximize everyone's safety.

21

b. Devereux and Belmont shall discuss the Augmentative Communication Evaluation conducted in March 2020 when it convenes the Team.

c. Belmont shall be responsible to fund the additional staff needed including, but not limited to, Dr. Latimer, a doctorate level BCBA consultant, and additional support staff.

d. Together with Parents, Belmont shall facilitate completion of the application process to JRC.

e. Belmont shall continue the search for an alternative placement until one becomes available for Student.

f. If, after making the necessary modifications as recommended by the Team, the Parties cannot implement sufficient measures to increase safety, and/or Student's behaviors deteriorate, Devereux may avail itself of additional remedies in court and Belmont shall create a program for Student until he transitions into DDS Adult Services.

57. Given the mixed nature of the BSEA decision, there is no clear "prevailing party" which would be entitled to recover attorneys' fees under § 1415(i)(3) of the IDEA. While the Hearing Officer did find that John could effectively stay put at Devereux, she also found that Devereux's emergency termination of John was done properly and in accordance with the applicable law and regulations.  She also agreed with Devereux that John hasn't received FAPE in this placement for much of 2020, and into 2021.  The hearing officer further found that Belmont has done everything that it could do to find a successor placement, though she ordered John's parents to finally complete the application process at JRC, which they had failed to do.  In light of these findings, there is no clear "prevailing party" worthy of recovering attorneys' fees from the other parties.

58. Devereux is aggrieved by the Hearing Officer's decision, which contains errors including, but not limited to, the following:

   a. The decision simply failed to consider and rule on Devereux's repeated defense that stay put does not apply to situations in which a private school like Devereux has lawfully terminated a student on an emergency basis pursuant to state law and regulation, in order to protect the health and safety of a student from imminent danger;

   b. The decision failed to give proper weight to the very existence of the emergency termination regulations themselves, thereby effectively rendering them a legal nullity; and

   c. The decision concluded that Devereux would remain the stay put placement following a proper emergency termination, when that conclusion was unsupported by the weight of the evidence.

The foregoing list is not intended to be an exhaustive list, and is not intended to limit the issues that the Plaintiff may raise on appeal.

**CAUSE OF ACTION**

**COUNT I -- (Individuals with Disabilities Education Act, 20 U.S.C. § 1415(i)(2))**

59. Devereux repeats and realleges Paragraphs 1 through 58 as if fully set forth herein.

60. The Hearing Officer's decision contains errors of law and fact and is unsupported by a preponderance of the evidence.

61. The Hearing Officer's decision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

62. The Plaintiff objects to the portions of the Hearing Officer's decision which concluded that Devereux was/is the Student's stay put placement despite the fact

that she also concluded that Devereux had conducted an emergency termination, and done so properly and in compliance with the appropriate regulations:

63. Devereux was a party to the BSEA proceedings that were brought by the Defendant Parents and Student.

64. The Hearing Officer concluded that John's placement is not appropriate, that he is not receiving FAPE and that there are "serious safety concerns that impact [John] and those around him."

65. If Devereux fails to maintain John's enrollment, it risks violating the decision of the BSEA.  (Rule XIII(C) of the BSEA Hearing Rules requires that the decision be implemented immediately).  If Devereux continues to maintain John's enrollment, its staff face a threat of irreparable harm because John engages in behavior that is a clear and imminent risk to the health and safety of not only himself, but also to Devereux staff.

66. John continues to present with life threatening and assaultive behaviors.

67. Devereux has an obligation to provide a safe environment for its staff and students. If Devereux is forced to maintain John's enrollment going forward, despite properly following the emergency termination procedures contained in the Massachusetts regulations, it would be placing its staff at risk of serious physical harm.

68. Devereux is not approved by the DESE to provide what amounts to the type of custodial care ordered by the Hearing Officer, rather than educational services (FAPE) to students such as John.  Devereux risks a threat to its approval status from DESE if it is required to maintain its enrollment of John.

**WHEREFORE,** Devereux requests that this Honorable Court:

A. Receive the records of the administrative proceeding and hear additional evidence as appropriate;

B. Reverse all portions of the Hearing Officer's decision and order specified in Paragraph 62 of its Complaint;

C. Issue a declaratory judgment establishing that:

   a. Stay put under 20 U.S.C. § 1415 (j) does not apply to a private special education school in Massachusetts which is terminating or has terminated a student on an emergency basis in accordance with the regulations promulgated by DESE; and

   b. The Student and his Parents are not entitled to recover any attorneys' fees against Devereux under § 1415(i)(3) of the IDEA and 34 C.F.R. § 300.517, on the grounds that (1) the Student and Parents are not to be considered "prevailing parties" with regard to the BSEA decision; and (2) that provision of the IDEA only applies to local educational agencies, state educational agencies, and parents; it does not apply to private special education schools such as Devereux; and

D. Such other relief as this Court deems just and proper.

Respectfully submitted,
Devereux Advanced Behavioral Health,
By its attorneys,

/s/   Joshua D. Krell

Joshua D. Krell, BBO #561619
Brown-Smith Attorneys at Law
300 TradeCenter, Suite 6750
Woburn, MA  01801
(617) 874-1800

jkrell@brownsmithlaw.com


/s/   *Roderick MacLeish*

Roderick MacLeish, BBO #311880
Gregg, Hunt, Ahern & Embry
One Cranberry Hill, Suite 304
Lexington, MA  02421
(617) 494-1920
rmacleish@ghaelaw.com


Dated:  May 4, 2021